# THOMAS A. WINDSOR *vs.* THE STATE OF MARYLAND.

*Oysters Taken From Private Beds Are Within the General Regulation as to Merchantable Oysters—Police Power.*

Code, Art. 72, sec. 8, provides that any person who shall have oysters in his possession which contain more than five per cent of shells, and oysters less than two and a-half inches from hinge to mouth, shall be guilty of a misdemeanor and subject to a fine. *Held*, that this provision applies to planted oysters taken from private beds in the waters of this State, as well as to oysters taken from natural beds or bars.

The Legislature has the right to prohibit the possession of oysters under a certain size, although taken from private beds, since such regulation is within the police power of the State to enact laws for the purpose of preserving game and fish, and such law is not in conflict with the Fourteenth Amendment of the Constitution of the United States.

Appeal from the Criminal Court of Baltimore City (HARLAN, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*George T. Mister* (with whom was *Beverly W. Mister* on the brief), for the appellants.

*Eugene 'O'Dunne* (with whom was *William S. Bryan, Jr.,* *Attorney-General*, on the brief), for the appellee.

PEARCE, J., delivered the opinion of the Court.

The appellant was indicted in the Criminal Court of Baltimore City under sec. 8 of Art. 72 of the Code of Public General Laws, for unlawfully having in his possession oysters which contained more than five per cent of shells, and oysters less than two and one-half inches from hinge to mouth. This section provides that "Any person who shall have oysters in his possession which contain more than five per cent of shells and oysters less than two and one-half inches from hinge to

mouth, which for the purpose of this article are declared to be unmerchantable oysters, shall be guilty of a misdemeanor; * * * and any person violating the provisions of this section shall be subject to the penalties and fines as provided in sec. 10 of this Article in precisely the same manner as if he were a captain of a boat."

The appellant filed a special plea alleging "that the oysters for the possession of which he has been indicted in these proceedings formed part of a cargo of oysters on board of a schooner of which he was master, and the oysters so constituting the said cargo were not taken from their natural oyster bed or bar, but were plants taken from planted oyster beds belonging to private owner or owners for whom the same were received on board and conveyed to the port of Baltimore."

The State demurred to this plea, and the demurrer being sustained by the Court, a plea of *non cul* was filed, and the case was submitted to the Court without a jury, upon an agreed statement of facts, as follows: "It is admitted by the attorneys for the State and the traverser respectively: That the oysters the traverser is charged with having in his possession in the indictment in this case, were inspected by a State inspector by culling two tubs therefrom, containing about three bushels of oysters, and that the said oysters so culled contained more than five per cent of shells, and oysters less than two and one-half inches, measuring from hinge to mouth of said oysters; and that said oysters as aforesaid were so in the possession of Thomas A. Windsor in said Baltimore City.

It is also admitted that the traverser would have testified that he is thirty-three years of age, and resides at Mount Vernon in the State of Maryland; that the oysters which he is charged with having in his possession in the indictment in this case, were planted oysters taken from private beds in the Wicomico river in said State of Maryland, and were not taken from any natural bed or bar; that at the time said oysters were in his possession they were aboard the schooner "Charles Butler," of which vessel he was master, and that he saw the oysters as they were brought aboard his said vessel; which the attorney for

the State hereby admits would be the testimony of the trav-
erser as fully as if given in open Court, and waives his right
of cross-examination, reserving only the right to object thereto
on the ground of irrelevancy. But the State did not interpose
said objection under the right so reserved."

The Court found the traverser guilty and imposed the fine
provided by law, and he has appealed from that judgment.

The only question presented under the demurrer or on the
agreed statement of facts is whether the facts alleged in the
special plea constitute a defense to the indictment.

· Sec. 46 of Art. 72 of the Code of Public General Laws, title
Oysters, gives to the owner of any land bordering upon any of
the waters of this State the power to locate and appropriate in
any of said waters adjoining his lands, one lot of five acres, not
being a natural bed or bar of oysters, "for the purpose of pro-
tecting, preserving, depositing, bedding, or sowing, oysters or
other shell fish thereon;" and if such land owner fails to make
such location or appropriation, within thirty days after notice
by any male citizen of this State, of full age, of his intention
to make such location, then such male citizen may make such
location or appropriation for himself. Sections 46 and 48 of
the same Article provide penalties for taking such planted
oysters without authority from the owner, when said lots are
marked or designated, and the description thereof is recorded,
as required by law, and for removing or injuring said marks
or designations.

While the privilege thus granted to the individual confers
no title to the land so located under the water, oysters so
bedded or deposited thereon become the private property of
the individual, subject only to the divestiture of title after his
death, if not removed from said location by his executor or
administrator within three years from such death; and the
special plea in this case is based upon two contentions: First,
that the prohibition against having in possession oysters con-
taining more than five per cent of shells, and oysters less than
two and a-half inches from hinge to mouth is contained in,
and is the essential provision of the culling feature of the stat-

ute, and that none of the sections, 7 to 14, relating to culling, have any application to oysters planted on private beds, and are applicable only to natural beds or bars reserved by the State for the common right of fishery; and, Second, that even if it be held that the Legislature designed this provision to apply to planted oysters, such restriction of the right to deal with private property would be in conflict with the Fourteenth Amendment to the Constitution of the United States, which declares that no State shall deprive any person of life, liberty, or property without due process of law, unless it clearly appears that the public safety, health, or morals would be affected by the prohibited act.

Section 8 of Art. 72, under which this indictment was found, was under consideration in this Court in *Tyler* v. *The State*, 93 Md. 309, where to an indictment like the present one, a special plea was filed asserting as a defense that the oysters in question had been taken from the waters of the State of Virginia by citizens of that State who had complied with its laws as to the taking of oysters in its waters, and had there been sold to the traverser.

In that case, the Court, following the reasoning in *Dickhaut* v. *State*, 85 Md. 451, came to the conclusion that that section was intended to apply only to oysters taken in Maryland waters; saying, "The law does not in express terms apply to oysters taken from waters outside the State. In that respect it differs from the Act of 1898, chap. 206, passed for the better protection of birds and game animals which was upheld by us in *Stevens* v. *State*, 89 Md. 669, and which by its terms makes it unlawful to have in possession, or expose for sale, during the closed season, birds or game animals shot or killed in this State, or in any other State, territory or country."

· The special plea in this case however does not deny that the oysters in question were taken from the waters of this State, and they must therefore be presumed to have been so taken ; the agreed statement of facts, moreover, expressly states that the traverser would testify they were taken from the waters of the Wicomico river in the State of Maryland, so that the

question is here squarely presented whether oysters taken from private beds in Maryland waters are within the spirit and intent of sec. 8 of Art. 72, as they ·clearly are within the letter of that section. The appellant's first contention is founded upon the construction he seeks to give to section 7 which provides that, "All oysters taken from *any of the waters of this* State either with scoops, dredges or any similar instruments, or tongs or rakes, shall be culled upon their natural bed or bar as taken, and all shells shall be returned to the bed or bar from which they were taken, and all oysters whose shells measure less than two and one-half inches in length, measuring from hinge to mouth, shall be included in said culling and replaced upon said bed or bar as taken. His argument is, that as the culling provided for is required to be done upon the natural bed or bar as taken, and as all shells and undersized oysters are required to be replaced upon said bed or bar as taken, the Legislature must have meant to restrict the requirement of culling to oysters taken from natural beds or bars in the waters of this State.

If this section were the only one in the Article which related to culling, or if it could be dissociated from other sections relating to that subject, and if it were permissible in its construction to ignore the chief purpose of all the legislation of this State relating to oysters, as disclosed by the whole of Article 72, and as declared by the decisions of this Court, the contention of the appellant might perhaps be sustained, but it could not otherwise be done.

It is common knowledge that almost the entire catch of ·oysters bought and sold in this State are taken from natural beds or bars, and that almost all the private lots located have been planted for private use, and not for market, and the knowledge of that fact doubtless will explain the use of the term, natural bed or bar, as used in section seven, after the general requirement for the culling of "all oysters taken from any of the waters of this State," and will satisfy any one seeking an unbiased construction of the section, that the words "natural bed or bar" were used without any intention thereby

to restrict the operation of the requirement to cull. The next succeeding section makes it a misdemeanor for anyone to have in his possession shells and oysters, which the preceding section require to be culled out, and there is no language referring to natural beds or bars, to limit the operation of that section to oysters taken from natural beds or bars. On the contrary all oysters under the prescribed size are declared to be *unmerchantable* for the purposes of *the whole article*, and no sound or satisfactory reason can be given for supposing that the Legislature meant to declare oysters under the prescribed size to be unmerchantable when taken from natural beds, but to be merchantable when taken from private lots. If this construction were adopted, unmerchantable oysters caught today could be deposited in the evening upon a private lot, and when taken up tomorrow would be converted into merchantable oysters.

Section 10 makes it unlawful for any person to purchase or receive any part of a cargo of oysters unless a measurer or inspector, shall cause a portion or all of the cargo in his discretion, to be culled in order to ascertain the percentage o shells and small oysters, imposes a fine upon the captain or person in charge of the vessel, and requires the unmerchantable oysters to be returned by him to the "ground or rocks whence taken," under the direction of the deputy commander on the beat; and the appellant contends from the use of the words, "ground or rocks whence taken," that this section refers only to oysters taken from natural beds or bars, oysters belonging to the public, and exempts those taken from private beds, because, as he argues, the State could have no interest in returning unmerchantable oysters to private beds. But referring again to sec. 8, it is seen that the measurers and inspectors are authorized and directed to cull any oysters from any pile, hold, bin, house or other place, and the same penalty is imposed upon any person found in possession of unmerchantable oysters as is imposed by sec. 10 upon the captain of any vessel in possession of such oysters. After oysters have been transferred from the vessel which bears them from

the waters where they were taken, to any house, bin or place as mentioned in sec. 8 and have been mingled with other oysters, it would be practically impossible to prove whether they were taken from natural bars or from private beds, and the construction contended for here would impute to the Legislature an intention which would defeat, instead of making effective, the culling feature of the law.

Section 13 empowers the general measurers and inspectors to enter into any house or any other place where oysters may be dumped or stored to inspect the same at any time, and anyone refusing to open his premises for this purpose is subjected to a fine of not less than $100 and not more than $500.

Without multiplying illustrations from other sections of this law, it must be apparent that its whole policy and purpose would be defeated by the adoption of the construction contended for; and this conclusion is sustained by the decisions of this Court whenever called on to construe the provisions of this Article.

In *Tyler* v. *State*, *supra*, in speaking of this same article and section, the Court said, "The obvious purpose of the Act under which this indictment was found was so to regulate the taking of oysters *from the waters of this State*, as to preserve for the benefit of its citizens the oyster beds which have proven to be a most valuable source of both food and occupation to the inhabitants of the counties bordering on the Chesapeake Bay and its tributaries. Experience in this field demonstrated the fact that taking from the beds the small oysters which were not fully matured tended to the early exhaustion of the sources of supply of oysters and the ultimate destruction of the important industries depending upon a continuance of the supply." The decline in the catch of oysters, and in the industry of canning oysters during the five years which have passed since that decision was rendered, emphasizes the importance of preserving and protecting the sources of supply, to be found only in the small and unmatured oysters, and of giving to the oyster law such a construction, wherever it can be fairly and properly done, as will best effectuate what was de-

clared in *Tyler* v. *State* to be the obvious purpose of the law. Especially will it be necessary to enforce these provisions of the law which define "unmerchantable oysters" and forbid their sale, if the operation of the law recently enacted, known as the "Haman Law," shall have the effect claimed by its supporters and advocates of building up a large and important industry of private planting for market purposes. If oysters taken from private lots are not required to be culled, then under the operation of the Haman Law, the natural beds and bars might, and almost surely would, be depleted of young oysters, to be planted upon private lots, and which could be sold as merchantable oysters, whenever the greed or necessity of the private planter might incline him to such course. From all these considerations to which we have adverted, the just and rational construction to be put upon the statute in question is, that all oysters taken from any of the waters of this State must be culled, and that all oysters less than two and a-half inches from hinge to mouth, whether taken from natural beds or from private lots are "unmerchantable oysters," and that any one having such oysters in his possession is liable to the penalty provided therefor.

In reference to the second contention of the appellant, that section 8, is an infringement of the Fourteenth Amendment to the Constitution of the United States, which declares that no one shall be deprived of life, liberty, or property, without due process of law, little need be said. In *Tyler* v. *State*, *supra*, this Court said, "We recently held in *Stevens* v. *State*, 89 Md. 669, that it is entirely with the power of the State to prohibit the having in possession or exposing to sale in this State, within the closed season, game which has been taken within the State or elsewhere. The same principle would apply to a prohibition against having in possession oysters of which more than a specified portion were of a size declared by law to be unmerchantable." In *Stevens* v. *State*, *supra*, the Court said, "The authorities agree that the ownership of all game, animals and birds is in the people in their sovereign capacity, that is in the State, and no individual has any property rights

in game other than such as the State may permit him to acquire, and even when game has been captured and reduced into possession by the individual with the permission of the State, his ownership in it may be regulated and restrained by appropriate legislation enacted for considerations of State or the benefit of the community. In other words, the cases hold that the question of enjoyment in this field is one of public policy, and not of private right."

This statement of the law is abundantly sustained by authority. JUDGE STORY says: "Property of every kind is held subject to those regulations which are necessary for the common good, and general welfare. And the Legislature has the power to define the mode and manner in which every one may use his property." *Story on the Constitution*, vol. 2, p.   This passage was cited and relied on in *Deems* v. *Mayor & City Council*, 80 Md. 173, in which it was held that the destruction of milk found to be impure by the lactometer, under a City ordinance, without prior judicial inquiry is not a taking of property without due process of law.

In *Lawton* v. *Steele*, 152 U. S. 138, the Supreme Court said: "The preservation of game and fish has always been treated as within the proper domain of police power, and laws limiting the season within which birds or animals may be killed or exposed for sale, and prescribing the time and manner in which fish may be caught, have been repeatedly upheld by this Court," and the later case of *Geer* v. *Connecticut*, 161 U. S. 519, the Supreme Court declares that "the right to preserve game flows from the undoubted existence in the State of a police power to that end," and sustains the right of the State to regulate the taking, *possession* and sale of game within the State, provided the laws by which such regulation is enacted are reasonably adapted to the end sought. A regulation forbidding the possession of immature oysters, made with a view to the preservation of the source of supply must be regarded as a reasonable regulation.

It follows that the demurrer to the special plea was properly sustained, and the judgment will therefore be affirmed.

*Judgment affirmed with costs to the appellee above and below.*
(Decided June 15th, 1906.)